IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2015-NMSC-035

Filing Date: October 30, 2015

Docket No. S-1-SC-35160

KAREN ROBINSON, IN HER
capacity as County Assessor,

Plaintiff-Appellee,

v.

BOARD OF COMMISSIONERS OF THE
COUNTY OF EDDY, ROXANNE LARA,
JOHN VOLPATO, JR., GUY E.
LUTMAN, LEWIS DERRICK, AND
TONY HERNANDEZ,

Defendants-Appellants.

CERTIFICATION FROM THE NEW MEXICO COURT OF APPEALS
Steven L. Bell, District Judge

Caraway, Tabor & Byers, L.L.P.
Matthew T. Byers
Carlsbad, NM

for Appellants

Bridget Ann Jacober
Santa Fe, NM

for Appellee

OPINION

BOSSON, Justice.

{1}     In 1986 our Legislature established a county property valuation fund to assist county assessors in fulfilling their statutory obligations to maintain current and correct values of all property within their jurisdictions. *See* NMSA 1978, § 7-36-16(A) (2000); NMSA 1978, §

1

7-38-38.1(C) (2007). The County Assessor for Eddy County (County Assessor or Assessor) sought to use some of these funds to contract with a private company for technical assistance in locating and valuing oil and gas property. The County Commission for Eddy County (County Commission) refused to approve the proposed plan because it believed that a contract to pay private, independent contractors to assist the County Assessor in the performance of the Assessor's statutory duties exceeded the Commission's lawful authority.

**{2}**     We are persuaded that the County Commission does have such authority under law, and that the contract under consideration here would not exceed that authority or be otherwise ultra vires. The district court having previously issued a declaratory judgment to that same effect, we affirm.

**BACKGROUND**

**{3}**     The parties presented this case to the district court on stipulated facts. We extract from the record the most salient of these stipulations to provide background and context.

1.      The current Property Tax Code ("PTC") was enacted in 1973 under Chapter 258.

2.      The PTC provides for "county property valuation fund[,"] NMSA 1978, §[ ]7-38-38.1 enacted in 1986. This law is remedial legislation intended to provide assessors with resources ("the 1% fund") to meet their statutory obligation to maintain current and correct values of all property within their jurisdiction. [Section 7-36-16].

3.      Expenditures from the county property valuation fund shall be made pursuant to a property valuation program presented by the county assessor and approved by a majority of the county commissioners.

4.      Beginning in 2007, Karen Robinson, as Eddy County Assessor, requested approval from the commissioners to use the 1% fund to contract for technical assistance in locating and valuing oil and gas property. Exhibit 5 (Eddy County Board of Commissioners Minutes).

5.      Each year, since 2008, the Eddy County Assessor submitted a property valuation program, which included an oil and gas audit. Each year a majority of the Eddy County commissioners approved the Assessor's property valuation program. *See*[] Exhibit 6 (2008 Budget Report); Exhibit 7 (2009 Budget Report); Exhibit 8 (2013 Budget Report).

6.      The Eddy County commissioners, however, would not agree that the oil and gas audit could be performed with appraisal assistance

2

procured through an independent contractor, even though monies available in the Assessor's 1% fund would pay the costs of the audit. Exhibit 5 (Minutes); Exhibit 9 (April 18, 2008 Letter from Robinson to PTD Director).

7. By constitutional provision and legislation, New Mexico counties are authorized to enter into contracts. . . .

. . . .

9. The sole prohibition on contracting by counties relates to transactions favoring persons who have been county employees within the preceding year. NMSA 1978, §[ ]4-44-24 [(1969, repealed 2011)].

. . . .

11. In 2007 and 2012, with the consent of the Eddy County Commission, the Assessor issued a Request for Proposals for an Eddy County Personal Property Audit. Exhibit 11 (Request for Proposals for Eddy County Oil and Gas Personal Property Audit Bid # B-07-20); Exhibit 12[] (Request for Proposals B-11-23 Eddy County Oil and Gas Personal Property Audit).

12. After evaluating the RFP responses in 2012, the Eddy County Assessor sought to have the Eddy County commissioners contract with the successful bidder, using the Assessor's 1% fund to pay for the contract services. Exhibit 5 (Minutes of March 14, 2012 Eddy County Commission meeting).

13. The Eddy County commissioners asserted that the Assessor did not have the legal authority to use contractual assistance to conduct an oil and gas property audit. *Id.*

14. The commissioners relied on *Fancher v. Board of Commissioners*, [1921-NMSC-039, 28 N.M. 179, 210 P.237,] in refusing to execute a contract to hire the technical assistance needed by the Assessor. Exhibit 5 (Minutes of March 14, 2012 Eddy County Commission meeting).

. . . .

17. The Eddy County commission also relies on the argument that the legislature's assignment of the "sole responsibility" and authority at the county level for property valuation maintenance, subject only to

3

the general supervisory powers of the director (NMSA 1978, §[ ]7-36-16(A)) prohibits the Assessor from contracting for appraisal assistance.

18. In other statutes, the legislature has employed the terms "sole responsibility" and "sole authority" to allocate liability and delegate power, not to restrict an official's actions. Exhibit 4 (Fastcase search of term "sole authority").

19. At the 2013 Eddy County commission budget hearings, the commissioners stated that if there were a court order declaring that the Assessor is permitted to utilize contractual assistance, the commissioners would sign the contract with the successful bidder responding to the 2012 RFP. Exhibit 5 (Minutes of March 14, 2012 Eddy County Commission meeting).

. . . .

25. A determination of the Assessor's legal authority to utilize contractual technical assistance in assessing property will impact all thirty-three assessors in New Mexico.

**{4}** As noted in the stipulated facts, the Legislature created the county property valuation fund to assist county assessors to maintain "current and correct values of property" within their jurisdiction. Section 7-36-16(A). Towards that end, the Legislature provided that "[e]xpenditures from the county property valuation fund shall be made pursuant to a property valuation program presented by the county assessor and approved by the majority of the county commissioners." Section 7-38-38.1(D). The fund is created through a 1% distribution of tax revenues from the county treasurer into that fund. The Legislature created this fund to provide county assessors with essential resources necessary to meet their statutory obligations.

**{5}** In this instance, the County Assessor duly submitted a "property valuation program" to the County Commission that included contracting with a private company to provide expert assistance in the valuation of oil and gas property located within the county, such as equipment and machinery. In withholding its approval, the only concern expressed by the County Commission was whether it was lawful to use money from the 1% fund to hire private independent contractors, as opposed to county employees, to provide technical assistance to the County Assessor. Importantly, the County Commission has never questioned the competency of the company chosen by the Assessor, nor is there a factual debate about whether the County Assessor actually needs technical assistance as she claims.

**{6}** After the County Commission withheld its approval, the County Assessor filed a declaratory judgment action asking the district court to determine whether the County

4

Assessor and the County Commission had the authority to contract with an independent contractor to assist the County Assessor in valuing property. The district court granted the declaratory judgment, concluding that "the Eddy County Board of Commissioners has legal authority to contract for technical assistance for the Assessor in performing her duties of maintaining the property tax rolls as correct and current."

{7}     Dissatisfied with the district court's ruling, the County Commission appealed to our Court of Appeals. The Court of Appeals heard oral argument and then, on its own motion, certified the case to this Court pursuant to Rule 12-606 NMRA. *Robinson v. Bd. of Comm'rs*, No. 32,998, order of certification (N.M. Ct. App. Mar. 12, 2015). The Court of Appeals advised us that the appeal presents significant questions of law and issues of substantial public interest of potential state-wide impact that should be determined by this Court. *Id.* ¶¶ 3, 4. Of particular concern to the Court of Appeals was the 1921 opinion from this Court in *Fancher*, 1921-NMSC-039, that needed to be addressed by this Court before the contract could proceed. We accepted certification.

**DISCUSSION**

{8}     This case is one of statutory construction. As such, we review the decision of the district court de novo. *See Marbob Energy Corp. v. N.M. Oil Conservation Comm'n*, 2009-NMSC-013, ¶ 5, 146 N.M. 24, 206 P.3d 135.

{9}     Encompassed within the stipulated facts, the parties agree that counties in New Mexico have constitutional and statutory authority to contract with outside parties. The parties further agree that "[t]he sole prohibition on contracting by counties relates to transactions favoring persons who have been county employees within the preceding year," which, of course, is not at issue in this case. *See* § 4-44-24 (1969, repealed 2011). Therefore, nothing in the statutory powers of counties stands in the way of the County Assessor's desired contract.

{10}     We turn, then, to the statutory powers of county assessors. The Property Tax Code, NMSA 1978, §§ 7-35-1 to -38-93 (1973, as amended through 2012), makes a general grant to county assessors of authority over valuation of property. "The county assessor is responsible and has the authority for the valuation of all property subject to valuation for property taxation purposes in the county . . . ." Section 7-36-2(A). Section 7-36-16(A) specifically states with respect to property valuation maintenance:

> County assessors . . . shall also implement a program of updating property values so that current and correct values of property are maintained and *shall have sole responsibility and authority at the county level for property valuation maintenance*, subject only to the general supervisory powers of the director [of the state property tax department].

(Emphasis added.)

5

**{11}** Clearly, the Legislature has reposed in county assessors the responsibility for maintaining "a program of updating property values" to reflect "current and correct values of property." *See id.* Simply put, the county assessor is in charge; it is the responsibility of that office to get the job done. The statute imposes no restrictions on how county assessors are to exercise that authority. The county commission's job is to assist the assessor. The Property Tax Code also allows a county assessor, subject to concurrence by the county commission, to request the director of the state Property Tax Division to provide technical assistance services in the valuation of major industrial or commercial properties subject to valuation by the assessor. *See* Section 7-36-19.

**{12}** To provide assessors with additional financial resources, the Legislature created the county property valuation fund in 1986. *See* § 7-38-38.1(C). Historical context is important. Prior to creating this fund, county assessors had the same responsibility for property valuation maintenance, but without the necessary financial resources to achieve that goal in a timely manner. This Court addressed this seeming paradox in *Appelman v. Beach*, 1980-NMSC-041, 94 N.M. 237, 608 P.2d 1119.

**{13}** In *Appelman*, the Bernalillo County Assessor began to reassess property values in 1974. 1980-NMSC-041, ¶ 3. By 1976, however, only 16% of property in the county had been reassessed. *Id.* This ultimately led to different tax rates for equivalent property which posed serious constitutional problems. *Id.* ¶ 9. As the *Appelman* Court described it, "[i]t is unlawful and grossly inequitable for one set of taxpayers to pay on market value and others to be charged at a much lower rate, as is indicated in this record." *Id.* ¶ 16. Bernalillo County conceded that the reappraisal program was progressing too slowly, but the record suggested that "the County did not have the manpower and money to have had all the county property reassessed" in a timely fashion. *Id.* ¶ 12.

**{14}** This Court, speaking in an unusually blunt manner, sharply criticized the Bernalillo County Commission for not allocating necessary resources to the Bernalillo County Assessor. *See id.* ¶ 16. Recognizing that the problem of scarce resources existed throughout the state, this Court observed: "It is common knowledge, of which we take judicial notice, that these flagrant inequities exist throughout the state. Public officials who are responsible for reappraisal programs mandated by the Legislature are to be *condemned* for permitting such manifest discrimination." *Id.* (emphasis added). This Court does not "condemn" county officials lightly. We did so in this instance because of our grave concern that county assessors were left without the necessary financial tools to do a job—of constitutional import—that the Legislature had assigned to them. Our opinion in *Appelman* was intended as a call to action.

**{15}** Only six years later, the Legislature enacted Section 7-38-38.1, a remedial statute

6

seemingly in response to this Court's criticism in *Appelman*.[1] The statute created a permanent source of additional revenue and directed county assessors to use those funds to achieve fair and timely reappraisal programs, exactly what the County Assessor seeks in this instance.

**{16}** Section 7-38-38.1 imposed no restrictions on the use of those funds other than it be part of a "property valuation program presented by the county assessor and approved by the . . . county commission[]." Section 7-38-38.1(D). The statute makes no attempt to restrict an assessor's options or discretion, such as whom to hire or with whom to contract. And of course, the statute does not preclude an assessor from securing additional expertise, either by way of additional employees or independent contractors.

**{17}** We can safely assume that the Legislature understood the need for essential resources at the county level and left it to county assessors and their county commissioners to decide how those resources should be spent, including the need for specialized expertise when it came to valuing personal property of a technical nature. The statute should be given an interpretation consistent with meeting its declared purpose.

**{18}** "Our primary goal when interpreting statutes is to further legislative intent." *State v. Strauch*, 2015-NMSC-009, ¶ 13, 345 P.3d 317 (internal quotation marks and citation omitted). We "examine the plain language of the statute as well as the context in which it was promulgated, including the history of the statute and the object and purpose the Legislature sought to accomplish." *Id.* ¶ 14 (internal quotation marks and citation omitted). We need to "promote the [L]egislature's accomplishment of its purpose." *Id.* ¶ 17 (internal quotation marks and citation omitted). Thus, the burden in this appeal is on the County Commission to persuade us how the Legislature could have spoken in such broad terms, unadorned by any express restrictions on county assessors, yet somehow have intended that the fund could not be used to contract for the necessary expertise.

**{19}** In an attempt to meet this burden, the County Commission argues that the Legislature, in delegating sole responsibility for property valuation maintenance to county assessors, intended that only assessor employees, and not private contractors, could assist in the revaluation process, even for technical property like oil and gas equipment that might require specialized expertise. The County Commission relies primarily upon a nearly century-old decision from this Court, *Fancher*, 1921-NMSC-039, for the proposition that where the Legislature gives sole authority to a public entity to perform a particular function,

---

[1]Initially, the County Commission argued that the County Assessor did not present any direct evidence that the Legislature enacted Section 7-38-38.1 in response to *Appelman*. However, during oral argument to this Court the County Commission conceded that the statute was a remedial statute in response to *Appelman*, but maintained that it still does not authorize the County Assessor to contract out her duties. The County Commission argued that the fund was only for hiring new employees.

7

all other persons or entities are excluded from participating in carrying out that function. *Fancher* is pivotal to the County Commission's case. If the County Commission reads *Fancher* correctly, then the County Assessor may not proceed with her contract with a private company. If the County Commission is not correct about *Fancher*, then the contract is lawful, and the County Commission's refusal to approve must give way. Accordingly, we now turn to a careful analysis of that 1921 opinion.

**{20}** In *Fancher*, the county commissioners for Grant County entered into a contract with Fancher Company for three purposes: 1) to make a complete record index system of all real property titles and provide it to the county clerk, 2) to furnish the county assessor with a complete and correct classification and indexing system for taxable properties located within the county including previously omitted properties, and 3) to transcribe and reproduce any records deemed necessary by the county clerk. 1921-NMSC-039, ¶ 1. Despite having satisfactorily completed the job with respect to both county offices, the county clerk and the county assessor, Fancher Company was denied payment for its services because the contract was deemed unlawful and ultra vires. *Id.* ¶¶ 3, 4.

**{21}** On appeal, this Court agreed that the contract was ultra vires and void because it usurped the duties of the respective county officials who were specifically assigned these same functions by express legislative direction. *See id.* ¶ 56; *see also id.* ¶ 11 ("Where authority is given to do a particular thing and the mode of doing it is prescribed, it is limited to be done in that mode; all other modes are excluded. This is a part of the so-called doctrine of *expressio unius est exclusio alterius*." (internal quotation marks and citation omitted)). This Court stated that "[t]he test is, not whether the duty is primary or secondary, but whether provision has been made by law for the accomplishment of the end, or the doing of the work, or the performance of the service, for the benefit of the public, in its organized capacity." *Id.* ¶ 54. We further stated that "[w]hether the agency created is as competent and capable as some private individual is to perform the service is not the subject of inquiry by the courts. This is a matter for legislative consideration exclusively." *Id.*

**{22}** We agree with our predecessors that the question at issue ultimately comes to "a matter for legislative consideration," in other words, legislative intent. *Id.* 100 years ago, in the Property Tax Code of 1915, the Legislature expressly assigned in great detail certain responsibilities to county officials and made its intent clear that those officials were to carry out those responsibilities, leaving no room for private assistance no matter how competent or helpful. *See Fancher*, 1921-NMSC-039, ¶ 55-56. It was, and still is, a matter of legislative intent. The question then arises whether the modern tax code delegates in a similarly micro-managing manner, not only of function but in its choice of agent to perform that function. We begin by examining how things were done a century ago as described in the *Fancher* opinion.

**{23}** We look first to county clerks, whose responsibilities under the Property Tax Code of 1915 included recording and maintaining land title records. *Fancher*, 1921-NMSC-039, ¶¶ 6-7. Anticipating the need for additional work with regard to land title records, the

8

Legislature provided that "whenever, in the opinion of the board of county commissioners" it might be necessary "to have a complete and accurate index made of all instruments of record affecting real property," then county commissions "are hereby authorized to have such index made by the county clerk of said county." *Id.* ¶ 6 (internal quotation marks and citation omitted). In other words, when the need for an index arises, the county was told to look to the county clerk. Since the Legislature had specified not only the subject matter (land title index) but also the agent to perform that function (county clerk), then the Legislature had left no room for the county commission to contract with someone else for the same purpose. It is not clear from the opinion whether the county clerk had even agreed to the imposition of a private contractor upon its functions.

**{24}** The *Fancher* Court came to a similar conclusion with respect to the county assessor and the state tax commission, both directed by statute to locate properties omitted from the tax rolls and include them in the proper records. When the county commission contracted with Fancher Company for completion of this task, this Court held the contract invalid, superseded by express assignment of that same function to the proper county officials. *Fancher*, 1921-NMSC-039, ¶¶ 55-56. In *Fancher*, it appears that the contract may have been opposed by the assessor and the state tax commission or at least that they may not have been willing participants.

> Provision, which the Legislature deemed sufficient, was made for officers and agents of such tax commission, and the compensation thereof. To hold that, notwithstanding such provisions, it would be competent for the county commissioners to employ other agencies, at public expense, to do this work thus provided for, would be to subject the public revenues of the different counties to dissipation *at the whim of the county commissioners*.

*Id.* ¶ 55 (emphasis added).

**{25}** We note that during those early days of our statehood, this was not the first instance of conflict between county officials, like assessors and clerks assigned certain duties by statute, and county commissions seemingly dissatisfied with those officials who contracted with outside agents to perform those same duties. See *State ex rel. Miera v. Field*, 1918-NMSC-071, ¶ 3, 24 N.M. 168, 172 P. 1136 ("Where, by law, the duty of performing certain work is cast upon a designated county official for which compensation is provided by law, it is not competent for the board of county commissioners to employ other persons to do the work required of such county official and to pay for such services.")

**{26}** Today, of course, the Property Tax Code has been completely rewritten; the language from 1915 has disappeared into history. That kind of detailed control over the means of implementation has largely been replaced by general grants of authority and responsibility, leaving the details to the discretion of the county official. And most importantly, the 1986 Legislature recognized a specific problem—unacceptable delays in updating property valuations—and created a specific answer—the 1% fund—to enable assessors to finish the

9

job without the restrictions of 100 years ago.

**{27}** If the legal threat to the *Fancher* Court was the county commission usurping the authority of local officials, this case presents the opposite scenario. It is the County Assessor who requests this contract to assist her in satisfying legislative intent, not undermining it. As a helpful analogy to *Fancher*, if the Legislature, in creating the property valuation fund, had directed that the fund could be used to hire additional employees to assist in valuation maintenance, then perhaps, by negative inference, the Legislature could be said to have excluded anyone else such as independent contractors. But that is not what happened here. The Legislature made no effort to instruct assessors on how to utilize this fund.

**{28}** We conclude, therefore, that the Legislature intended to leave it to the professional discretion of those same assessors to decide how best to achieve the statutory goal of current and correct valuation of all property within the county. This is especially the case given the exhortations of this very Court over 30 years ago in *Appelman* to get the job done. 1980-NMSC-041, ¶ 16.

**{29}** The County Commission points out that Section 7-36-16(A) uses language that appears to delegate *exclusive* authority to the Assessor to update property values which would preclude anyone else. *See id.* (County assessors "shall have sole responsibility and authority at the county level for property valuation maintenance."). But we see no contradiction. The County Assessor seeks to contract for technical assistance to enable her, the County Assessor, to maintain current and correct property valuations. She has "sole responsibility" over valuations. The County Assessor is not being displaced as were the officials in *Fancher*; she remains at the center of the process. Final valuations will issue from her office under her signature as the law envisions. Additionally, the parties stipulated in this case that "[i]n other statutes, the [L]egislature has employed the terms 'sole responsibility' and 'sole authority' to allocate liability and delegate power, not to restrict an official's actions."

**{30}** The County Commission also directs our attention to a provision in the Property Tax Code that allows the state Property Tax Division to contract with counties and provide technical assistance to county assessors regarding the valuation process. *See* Section 7-36-19. Again relying on *Fancher*, the County Commission asserts that this option for the County Assessor precludes all others. But if we were to accept that assertion, we would be forced to turn a blind eye to what the Legislature did subsequently in 1986 when it created the property valuation fund. Obviously, the means previously available to county assessors to maintain current and correct valuations were deemed insufficient to complete the job. This Court said as much in *Appelman.* It would make little sense for the Legislature to have created a new fund to address an ongoing problem of constitutional proportions, but then to limit assessors' remedies to what had been available all along.

**{31}** The County Commission also points to legislative history of previous iterations of the Property Tax Code, including a time, 1933, when the Property Tax Code was changed

to expressly authorize assessors to hire independent contractors, and then years later in 1969 when that authority was withdrawn in favor of better training for assessor employees. *Compare* 1933 N.M. Laws, ch. 107, § 16 *with* 1969 N.M. Laws, ch. 219, § 16 (repealing the 1933 provision) *and* 1969 N.M. Laws, ch. 269, §§ 1-3 (providing for training in property appraisal and property tax administration and increased pay for county assessors with additional training). We are not persuaded. Better training and education of assessor employees is consistent, not inconsistent, with the goal evidenced by creating the property valuation fund—namely, additional resources to enable county assessors to complete the job of periodic valuation maintenance. The assessor might not be authorized, for example, to replace employees with a staff of independent contractors, but that is not the same as allowing assessors to supplement their employees with specialized technical assistance not available from staff employees.

**{32}** Finally, the County Assessor has pointed out that other counties within New Mexico have contracted for years with private companies—with state approval—to assist their county assessors, in some cases providing the type of precise valuation expertise for oil and gas properties at issue in this case. The County Commission acknowledges the validity of this evidence and that a ruling in its favor might have a negative impact on these other counties. Interpreting the law as we do, to authorize the County Assessor to contract for technical assistance from private contractors, we anticipate no such negative impact.

**CONCLUSION**

**{33}** We hold that state law does not prohibit the Eddy County Commission from approving a contract with an independent contractor to assist the County Assessor, at her request, in valuing property. Accordingly, we affirm the declaratory judgment to that effect previously entered by the district court.

**{34} IT IS SO ORDERED.**

 

 

**RICHARD C. BOSSON, Justice**

**WE CONCUR:**

**BARBARA J. VIGIL, Chief Justice**

**PETRA JIMENEZ MAES, Justice**

**EDWARD L. CHÁVEZ, Justice**

_____
**CHARLES W. DANIELS, Justice**